**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

R. ALEXANDER ACOSTA, Secretary of Labor,
United States Department of Labor,

        Plaintiff,

        v.

DAY-MONT BEHAVIORAL HEALTH CARE,
INC., an Ohio Corporation;

DAY-MONT WEST TAX-DEFERRED ANNUITY
PLAN, an employee benefit plan;

DAY-MONT BEHAVIORAL HEALTH CARE
INC. EMPLOYEE BENEFIT PLAN, an employee
benefit plan;

GAYLE JOHNSON, an individual; and

AKIL SHARIF, an individual;

        Defendants.

Civil Action File

No. 3: 18-cv-242

<u>COMPLAINT</u>

Plaintiff, R. Alexander Acosta, Secretary of Labor, United States Department of Labor,

hereby alleges:

1. This action arises under Title I of the Employee Retirement Security Act of 1974

("ERISA"), as amended, 29 U.S.C. §§ 1001-1191c, and is brought by the Secretary under

ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5), to enjoin acts and practices that

violate the provisions of Title I of ERISA, to obtain appropriate equitable relief for breaches

of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to obtain such further equitable

relief as may be appropriate to redress violations and to enforce the provisions of ERISA.

2. This action is filed against Day-Mont Behavioral Health Care, Inc. ("Day-Mont"), an Ohio Corporation; Gayle Johnson ("Johnson"), an individual; and Akil Sharif ("Sharif"), an individual, (collectively "Defendants").

3. Defendants were or are fiduciaries of the Day-Mont West Tax-Deferred Annuity Plan ("Annuity Plan"), an employee pension benefit plan as defined by ("ERISA"), and of the Day-Mont Behavioral Health Care Inc. Employee Benefit Plan ("Health Plan"), an employee welfare benefit plan as defined by ERISA.

## JURISDICTION AND VENUE

4. This court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

5. The Annuity Plan and the Health Plan are employee benefit plans within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), which are subject to the provisions of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a).

6. Venue of this action lies in the Southern District of Ohio pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because at all relevant times, the Annuity Plan and the Health Plan have been administered in Dayton, Montgomery County, Ohio, within this district.

## DEFENDANTS

7. Defendant Day-Mont is an Ohio non-profit corporation providing mental health and addiction treatment services in Dayton, Ohio.

8. At all relevant times, Day-Mont exercised discretionary authority and control respecting the management and disposition of the Annuity Plan and its assets and exercised discretionary authority and responsibility in the administration of the Annuity Plan and thus was and is a

2

fiduciary of the Annuity Plan within the meaning of ERISA §§ 3(21)(A)(i), 29 U.S.C. §§ 1002(21)(A)(i).

9. The Annuity Plan's governing document names Day-Mont as Plan Administrator, and thus, at all relevant times, Day-Mont was and is a fiduciary of the Annuity Plan within the meaning of ERISA §§ 3(21)(A)(iii), 29 U.S.C. §§ 1002(21)(A)(iii).

10. For the reasons identified in ¶ 8-9, at all relevant times, Day-Mont was and is a party in interest to the Annuity Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

11. At all relevant times, Day-Mont exercised discretionary authority and control respecting the management and disposition of the Health Plan and its assets and exercised discretionary authority and responsibility in the administration of the Health Plan and thus was and is a fiduciary of the Health Plan within the meaning of ERISA §§ 3(21)(A)(i), 29 U.S.C. §§ 1002(21)(A)(i).

12. The Health Plan's governing document names Day-Mont as Plan Administrator, and thus, at all relevant times, Day-Mont was and is a fiduciary of the Health Plan within the meaning of ERISA §§ 3(21)(A)(iii), 29 U.S.C. §§ 1002(21)(A)(iii).

13. For the reasons identified in ¶ 11-12, at all relevant times, Day-Mont was and is a party in interest to the Health Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

14. The Annuity Plan is an ERISA-covered defined contribution plan under I.R.C. § 403(b), established effective January 1, 1996.

15. The Health Plan is an employee welfare benefit plan, established effective February 1, 1992.

16. During the period February 1, 1992 to May 25, 2015 ("Health Plan Period 1"), the Health Plan's benefits were self-funded by Day-Mont and included medical, prescription drug, vision, and dental benefits.

17. During the period May 25, 2015 to August 31, 2015 ("Health Plan Period 2"), the Health Plan's benefits were funded by a fully-insured policy with UnitedHealthcare Life Insurance Company ("UHC"), Group Policy Number GA5U9418NM.

18. During the period November 15, 2015 to June 15, 2016 ("Health Plan Period 3"), the Health Plan's benefits were funded by a second fully-insured policy through UHC, Group Policy Number GA8U1779NM.

19. The Annuity Plan and Health Plan are named as defendants herein pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

20. Defendant Johnson was Day-Mont's President and Chief Executive Officer (CEO) from 1984 until her retirement on August 31, 2016.

21. Defendant Sharif was Day-Mont's Chief Financial Officer (CFO) and Vice President of Finance from 1984 until his termination on April 29, 2016. During this time period, Day-Mont's Financial Department ("Financial Department") operated under Sharif's direction.

22. Following Sharif's termination on April 29, 2016, his position was not filled, and Johnson assumed his duties until her retirement on August 31, 2016. During this time period, the Financial Department operated under Johnson's direction.

23. From, at the latest, January 26, 2016 until August 31, 2016, Johnson exercised discretionary authority and control respecting the management and disposition of the Annuity Plan and its assets and exercised discretionary authority and responsibility in the administration of the Annuity Plan. Thus, for at least these dates, she was a fiduciary of the Annuity Plan within the meaning of ERISA §§ 3(21)(A)(i), 29 U.S.C. §§ 1002(21)(A)(i), and a party in interest to

the Annuity Plan within the meaning of ERISA §§ 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H).

24. From, at the latest, February 19, 2015 until August 31, 2016, Johnson exercised discretionary authority and control respecting the management and disposition of the Health Plan and its assets and exercised discretionary authority and responsibility in the administration of the Health Plan.  Thus, for at least these dates, she was a fiduciary of the Health Plan within the meaning of ERISA §§ 3(21)(A)(i), 29 U.S.C. §§ 1002(21)(A)(i), and a party in interest to the Health Plan within the meaning of ERISA §§ 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H).

25. From January 1, 1996 until April 29, 2016, Sharif exercised discretionary authority and control respecting the management and disposition of the Annuity Plan and its assets and exercised discretionary authority and responsibility in the administration of the Annuity Plan. Thus, for these dates, he was a fiduciary of the Annuity Plan within the meaning of ERISA §§ 3(21)(A)(i), 29 U.S.C. §§ 1002(21)(A)(i), and a party in interest to the Annuity Plan within the meaning of ERISA §§ 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H).

26. From February 1, 1992 until April 29, 2016, Sharif exercised discretionary authority and control respecting the management and disposition of the Health Plan and its assets and exercised discretionary authority and responsibility in the administration of the Health Plan. Thus, for these dates, he was a fiduciary of the Health Plan within the meaning of ERISA §§ 3(21)(A)(i), 29 U.S.C. §§ 1002(21)(A)(i), and a party in interest to the Health Plan within the meaning of ERISA §§ 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H).

<u>COUNT 1</u>

<u>Failure to Remit and Timely Remit Annuity Plan Contribution Withholdings</u>

27. Paragraphs 1-26 above are realleged and incorporated herein by reference.

28. The Annuity Plan is a defined contribution plan under ERISA § 403(b), established effective January 1, 1996. The Annuity Plan allows participants to make contributions through payroll deferrals. Day-Mont would match a certain percentage of participant contributions.

29. The Annuity Plan's asset custodian is Voya Retirement Insurance and Annuity Co., previously known as ING ("ING/Voya"). Annuity Plan assets are participant directed and invested in fixed and variable return mutual funds.

30. At all relevant times, the Financial Department processed payroll in-house on a bi-weekly basis. Once a participant was enrolled in the Annuity Plan, Financial Department staff withheld their respective contributions each bi-weekly pay period. Withholdings for contributions would not be placed in designated accounts, but rather would be commingled with Day-Mont's general funds.

31. Until pay-date May 29, 2015, Financial Department staff would print the appropriate Annuity Plan remittance checks to be mailed to ING/Voya. All checks needed to be signed by both Johnson and Sharif. At least one signature needed to be by hand, while the other could be stamped by Financial Department staff.

32. Until pay-date May 29, 2015, Sharif would personally sign the Annuity Plan remittance checks by hand, while Financial Department staff would stamp Johnson's name.

33. Until 2012, Financial Department staff would remit participant contributions to ING/Voya no later than 5 workdays after contributions were withheld. However, beginning with pay-date January 27, 2012, Sharif would decide when to mail the remittance checks, mailing them as late as 270 business days after withholding from participant paychecks.

34. For pay-dates May 1 and May 15, 2015, some participant withholdings were untimely remitted to ING/Voya, while others were not remitted at all.

35. For the May 29, 2015 pay-date, Sharif instructed payroll staff to stop printing remittance checks for the Annuity Plan.

36. On or about August 27, 2015, several Annuity Plan participants informed Johnson and Sharif of contributions missing from the participants' individual Annuity Plan accounts.

37. During September, 2015, Johnson, acting on behalf of Day-Mont, hired a private accounting firm, Flagel Huber Flagel ("Flagel"), to examine both Day-Mont's funding sources and financial obligations. On October 30, 2015, Flagel gave Johnson a report indicating, among other findings, that withholdings had not been remitted to the Annuity Plan for several months. Flagel's report advised Day-Mont to either resume remitting withholdings or stop withholding participant contributions from participant's payroll pay checks. Defendants did neither, and continued withholding participant contributions, not printing remittance checks, and not remitting the withholdings.

38. At a January 26, 2016 meeting of Day-Mont's Board of Directors ("Board"), Johnson and a Board member discussed if and when Day-Mont should reimburse Annuity Plan members for the unremitted Annuity Plan withholdings.

39. On March 17, 2016, the Department of Labor, Employee Benefits Security Administration ("EBSA") delivered to Defendants a Voluntary Compliance Letter ("Annuity Plan VCL") outlining the results of its investigation into the Annuity Plan.

40. Day-Mont resumed printing the remittance checks for the April 1, 2016 pay-date. Remittance checks for the April 1, 2016 pay-date were signed by hand by both Johnson and Sharif.

41. Following Sharif's termination on April 29, 2016, remittance checks for the April 29, May 13, May 27, July 8, and July 22, 2016 pay-dates were signed by Johnson only with Financial Department staff stamping Sharif's signature.

42. Day-Mont stopped withholding participant contributions from participants' payroll pay checks on August 5, 2016.

43. For certain pay-dates between January 27, 2012 and May 15, 2015, and for pay-dates April 29, May 13, May 27, July 8, and July 22, 2016, withholdings deducted from participants' payroll pay checks were remitted to ING/Voya up to 270 workdays after withholding from participant paychecks.

44. For pay-dates between May 1, 2015 and March 18, 2016, and for pay-dates July 26, 2013, and April 15, June 10, and June 24, 2016, withholdings of $39,964.57 were deducted from participants' payroll pay checks, but were not remitted at all to ING/Voya.

45. By the conduct described in paragraphs 27 through 44 above, Defendants:

   a. Failed to ensure that all assets of the Annuity Plan were held in trust and did not inure to the benefit of Day-Mont, in violation of ERISA §403(a) and (c)(1), 29 U.S.C. § 1103(a) and (c)(1);

   b. Failed to act solely in the interest of the participants and beneficiaries of the Annuity Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Annuity Plan's administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

   c. Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

d. Caused the Annuity Plan to engage in transactions which they knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Annuity Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

e. Dealt with assets of the Annuity Plan in their own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1); and

f. Acted on behalf of a party whose interests are adverse to the interests of the Annuity Plan or the interests of its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

## COUNT 2

### Failure to Inform Participants During Health Plan Period 1 of
### Day-Mont's Inability to Pay Newly-Incurred Claims

46. Paragraphs 1-26 above are realleged and incorporated herein by reference.

47. During Health Plan Period 1 (February 1, 1992 to May 25, 2015), the Health Plan was a self-funded welfare plan providing medical, prescription drug, vision, and dental benefits. From February 1, 2001 to May 25, 2015, Underwriters Services Corporation ("Underwriters") processed Health Plan claims for Day-Mont under an Administrative Services Agreement ("ASA").

48. During Health Plan Period 1, Day-Mont shared the expenses of providing the Health Plan with plan participants.

49. During Health Plan Period 1, plan participant contributions were withheld from employee paychecks every two weeks.

50. These withholdings acted prospectively, serving to grant the plan participant coverage under the Health Plan for the following two weeks.

51. The withholding amount varied per employee based on the level of coverage requested and the number of family member participants obtaining coverage through each employee.

52. During Health Plan Period 1, providers would bill Underwriters for services incurred by Health Plan participants. Underwriters then discounted the claims using the Medical Mutual of Ohio ("MMO") in-network discount, and billed Day-Mont at the lower repriced rate. Day-Mont was responsible for paying the amount specified by Underwriters as due. After Underwriters processed a claim and billed Day-Mont for the repriced amount of the claim, Sharif was responsible for wire transferring the requested funds from Day-Mont to Underwriters.

53. Throughout 2014, Day-Mont began to delay payments to Underwriters between 30 and 60 days.

54. In response to a backlog of unpaid claim funding requests from Underwriters, on or about February 19, 2015, Johnson and Sharif negotiated a payment plan with Underwriters ("payment plan"). The payment plan required that Day-Mont would pay a total of fourteen outstanding funding requests by March 27, 2015. Day-Mont completed these payments by April 9, 2015.

55. Day-Mont failed to pay Underwriters for new funding requests from Underwriters between February 20 and May 25, 2015 when due.

56. On May 18, 2015, Underwriters canceled the ASA for any new claims, effective May 25, 2015.

57. On June 10, 2015, Johnson, on behalf of Day-Mont, entered into a Letter of Understanding ("LoU") for Underwriters to process and reprice the outstanding medical claims incurred

10

before May 25, 2015 under the Health Plan ("run-out claims"). The LoU obligated Day-Mont to pay Underwriters by July 31, 2015 for run-out claims that had been processed by Underwriters as of May 25, 2015 ("first run-out claims").

58. Day-Mont did pay for the first run-out claims, as required by the LoU.

59. The LoU further obligated Day-Mont to pay, within two weeks of receipt, any additional run-out claims processed by Underwriters after May 25, 2015 ("second run-out claims").

60. Day-Mont did not pay for any of the second run-out claims and did not communicate with Underwriters to request any extensions to pay. As a result, Underwriters cancelled the LoU, effective October 14, 2015 and forwarded to Day-Mont all second run-out claims, without processing them and without applying the MMO in-network discount.

61. As forwarded from Underwriters to Day-Mont, the unpaid second run-out claims total $134,317.36.

62. Had Day-Mont maintained the MMO repricing discount through Underwriters, it would have only owed $69,844.40 for the second run-out claims.

63. Throughout late 2015 and early 2016, Health Plan participants were pursued by providers and debt collectors for the second run-out claims.

64. From late 2015 through early 2016, Health Plan participants repeatedly asked Johnson and Sharif about the status of the second run-out claims. Johnson told participants to ask Sharif about the status of payments. Sharif repeatedly told participants that Defendants were investigating the eligibility of these claims, but did not inform participants that Day-Mont would not be able to pay these claims. As Day-Mont's CEO and CFO and as signatories on its bank accounts, both Johnson and Sharif knew or should have known that Day-Mont would be unlikely to pay these claims.

65. At the February 23, 2016 meeting of Day-Mont's Board, Sharif prepared a list of Day-Mont's outstanding liabilities, including the second run-out claims. Board members extensively questioned both Johnson and Sharif regarding these claims. Johnson indicated that she knew Health Plan participants and Day-Mont could be pursued for these claims and wanted to work out payment plans with the providers to settle them. However, Johnson informed the Board that she was prioritizing the payment of vendors necessary for Day-Mont's continued operation, two of whom had already sued Day-Mont for nonpayment.

66. At no time prior to, at the earliest, May 18, 2015, did Defendants inform Health Plan participants that Day-Mont was delaying payments to Underwriters due to its inability to pay health claims within the timeframes to which it had previously agreed.

67. At no time prior to, at the earliest, May 18, 2015, did Defendants inform Health Plan participants of the February 19, 2015 payment plan, which Day-Mont had entered due to its inability to pay health claims within the timeframes to which it had previously agreed.

68. At no time prior to, at the earliest, May 18, 2015, did Defendants inform Health Plan participants that Day-Mont had failed to pay Underwriters for new funding requests from March, April, and May 2015.

69. Defendants' failures, during Health Plan Period 1, to inform participants of Day-Mont's financial condition and difficulties paying health claims constitute material misrepresentations of Day-Mont's financial condition and the status of participants' benefits under the Health Plan.

70. Had Defendants informed Health Plan participants of Day-Mont's financial condition and the status of participants' benefits under the Health Plan, at least some participants would not have incurred the run-out claims between February 19 and May 25, 2015, either by obtaining alternative health care coverage or by delaying voluntary procedures.

71. Health Plan participants were harmed by Defendants' material misrepresentations because they incurred additional claims between February 19 and May 25, 2015 that they would not have incurred, but for Defendants' misrepresentations.

72. By the conduct described in paragraphs 46 through 71 above, Defendants:

    a. Failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Health Plan's administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

    b. Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

## COUNT 3

### Failure to Remit Premium Withholdings Following Health Plan Period 2

73. Paragraphs 1-26 above are realleged and incorporated herein by reference.

74. During Health Plan Period 2 (May 25, 2015 to August 31, 2015), benefits under the Health Plan were funded with a fully-insured policy under Group Policy Number GA5U9418NM with UHC. Health Plan participants paid a portion of the monthly premium, and Day-Mont paid the balance. From pay-dates May 29, 2015 through October 2, 2015, employees had their portion of the premiums withheld from their biweekly paychecks.

75. Following UHC's cancellation of Group Policy Number GA5U9418NM, effective September 1, 2015, Day-Mont continued to deduct participant contributions from employees' pay-checks for payroll dates September 4, September 18, and October 2, 2015,

but did not remit these premiums to UHC. On these pay-dates, Day-Mont withheld but did not remit a total of $10,416.00 in premium contributions.

76. Between October 9, 2015 and February 26, 2016, Day-Mont refunded $9,206.00 in unremitted premium deductions to employees who remained employed with Day-Mont, but did not refund $1,210.00 in unremitted premium deductions to employees who had left Day-Mont between September and December 2015.

77. By the conduct described in paragraphs 73 through 76 above, Defendants:

    a. Failed to ensure that all assets of the Health Plan were held in trust and did not inure to the benefit of Day-Mont, in violation of ERISA §403(a) and (c)(1), 29 U.S.C. § 1103(a) and (c)(1);

    b. Failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Health Plan's administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

    c. Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

    d. Caused the Health Plan to engage in transactions which they knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Health Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

    e. Dealt with assets of the Health Plan in their own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1); and

f.  Acted on behalf of a party whose interests are adverse to the interests of the Health Plan or the interests of its participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

COUNT 4

Failure to Inform Health Plan Participants of the

Cancellation of Coverage Following Health Plan Period 2

78. Paragraphs 1-26 and 74-76 above are realleged and incorporated herein by reference.

79. During Health Plan Period 2, under Group Policy Number GA5U9418NM, premiums were due to UHC on the 1st of each month, with a 31 day grace period before cancellation of the policy.  Sharif was responsible for wiring the withheld employee contributions and Day-Mont's contributions together to UHC.

80. Throughout summer 2015, Day-Mont's premium payments to UHC were continually late, with Day-Mont paying the July 1, 2015 premium on the last day of the grace period, July 31, 2015.

81. On August 31, 2015, Sharif made a partial payment of $15,000 toward the August 1, 2015 premium.  As a balance of $41,898.60 remained unpaid after the grace period, UHC cancelled Group Policy Number GA5U9418NM, effective September 1, 2015.

82. As of, at the latest, September 3, 2015, Health Plan participants informed Johnson and Sharif that when these participants attempted to use the Health Plan for medical and prescription claims, the claims were being denied, due to the policy having been cancelled.

83. Day-Mont received an "Account Termination Notice" from UHC cancelling Group Policy Number GA5U9418NM no later than September 9, 2015. The Account Termination Notice

directed Day-Mont to "[p]lease advise your employees immediately that their coverage has been cancelled."

84. Throughout September, 2015, Johnson and Sharif negotiated with UHC in an attempt to get Group Policy Number GA5U9418NM retroactively reinstated. On September 17, 2015, Sharif had Day-Mont pay the balance of the August 1, 2015 premium towards this end. However, as the September 1, 2015 premium remained unpaid, UHC refused to reinstate Group Policy Number GA5U9418NM.

85. Throughout September, 2015, additional Health Plan participants contacted both Johnson and Sharif to inform them that their claims were being denied and inquiring as to whether the Health Plan's insurance policy was cancelled and if it would be reinstated.

86. Until at least September 23, 2015, both Johnson and Sharif reassured Health Plan participants that they were working to get the Health Plan's insurance policy reinstated retroactively or that the participants would be reimbursed for uncovered health claims they incurred. As Day-Mont's CEO and CFO and as signatories on Day-Mont's bank accounts, both Johnson and Sharif knew or should have known that Day-Mont would be unlikely to get the Health Plan's insurance policy reinstated retroactively or that participants would be reimbursed for uncovered health claims they incurred.

87. On or about October 1, 2015, Sharif began informing individual Health Plan participants who inquired that the Health Plan's insurance policy had been cancelled and would not be reinstated retroactively. Only a few individual Health Plan participants inquired and were informed of the cancellation of the Health Plan's insurance policy between October 1 and October 7, 2015.

88. On October 7, 2015, with Johnson's permission, Sharif sent an email to all Day-Mont employees notifying them of the cancellation of the Health Plan's insurance policy.

89. At no time prior to, at the earliest, September 3, 2015, did Defendants inform Health Plan participants that the July 1, 2015 premium payment had been paid late.

90. At no time prior to, at the earliest, September 3, 2015, did Defendants inform Health Plan participants that the August 1, 2015 premium payment had not been paid in full during the grace period.

91. At no time prior to, at the earliest, September 23, 2015 did Defendants inform any Health Plan participants that the Health Plan's insurance policy had been cancelled and would not be retroactively reinstated.

92. Upon information and belief, at no time prior to, at the earliest, October 7, 2015, did Defendants inform all Health Plan participants that the Health Plan's insurance policy had been cancelled and would not be retroactively reinstated.

93. Defendants' failure to timely inform Health Plan participants that Day-Mont had paid late or not paid premium payments due to UHC under the Health Plan's insurance policy constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

94. Defendants' failure to timely inform Health Plan participants of the Health Plan's continued effectiveness and affirmatively representing otherwise each constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

95. Defendants' failure to timely inform Health Plan participants of Day-Mont's inability to retroactively reinstate the Health Plan's insurance policy constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

96. Health Plan participants were harmed by Defendants' material misrepresentations because they incurred uncovered claims between September 1 and October 7, 2015 that they would not have incurred, but for Defendants' misrepresentations.

97. Had Defendants informed Health Plan participants that Day-Mont had paid late or not paid in full premium payments to UHC, that the Health Plan's insurance policy had been cancelled, or that the Health Plan's insurance policy would not be reinstated, at least some participants would not have incurred uncovered claims, either by obtaining alternative health care coverage or by delaying voluntary procedures.

98. By the conduct described in paragraphs 78 through 97 above, Defendants:

    a. Failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Health Plan's administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

    b. Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

## COUNT 5

### Failure to Remit Premium Withholdings Following Health Plan Period 3

99. Paragraphs 1-26 above are realleged and incorporated herein by reference.

100. During Health Plan Period 3 (November 15, 2015 to June 14, 2016), benefits under the Health Plan were funded with a fully-insured policy under Group Policy Number GA8U1779NM with UHC. Health Plan participants paid a portion of the monthly premium, and Day-Mont paid the balance. From pay-dates November 27, 2015 through July 8, 2016, employees had their portion of the premiums withheld from their biweekly paychecks.

101.  Following UHC's cancellation Group Policy Number GA8U1779NM, effective on June 14, 2016, Day-Mont continued to deduct participant premium contributions from employees' pay-checks for pay-dates June 24 and July 8, 2016 but did not remit these premiums to UHC. On these pay-dates, Day-Mont withheld but did not remit a total of $3,345.98 in premium contributions.

102.  By the conduct described in paragraphs 99 through 101 above, Day-Mont and Johnson:

    a.  Failed to ensure that all assets of the Health Plan were held in trust and did not inure to the benefit of Day-Mont, in violation of ERISA §403(a) and (c)(1), 29 U.S.C. § 1103(a) and (c)(1);

    b.  Failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Health Plan's administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

    c.  Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

    d.  Caused the Health Plan to engage in transactions which they knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Health Plan, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

    e.  Dealt with assets of the Health Plan in their own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1); and

f.  Acted on behalf of a party whose interests are adverse to the interests of the Health

Plan or the interests of its participants and beneficiaries, in violation of ERISA

§ 406(b)(2), 29 U.S.C. § 1106(b)(2).


COUNT 6

Failure to Inform Participants of the Cancellation of Coverage Following Health Plan Period 3

103.    Paragraphs 1-26 and 100-101 above are realleged and incorporated herein by

reference.

104.    During Health Plan Period 3, under Group Policy Number GA5U9418NM,

premiums were due to UHC on the 15th of each month, with a 31 day grace period before

cancellation of the policy.

105.    Until his termination on April 29, 2016, Sharif was responsible for wiring the

withheld employee contributions and Day-Mont's contributions together to UHC. After

Sharif's termination, Johnson was responsible for wiring the withheld employee

contributions and Day-Mont's contributions together to UHC.

106.    For the January 15, 2016 premium, Day-Mont did not initiate a wire transfer

payment until February 12, 2016.  On February 16, 2016, UHC cancelled Group Policy

Number GA5U9418NM, effective February 16, 2016, as a balance of $25,391.80 remained

unpaid after the grace period.  UHC's cancellation notice required Day-Mont to "[p]lease

advise your employees immediately that their coverage has been cancelled."  UHC received

the wire transfer payment on February 18, 2016, and on February 19, 2016, it retroactively

reinstated the policy.  Neither Johnson nor Sharif informed plan participants of Group

Policy Number GA5U9418NM's cancellation and reinstatement.

107. Day-Mont paid the March 15, 2016 premium on April 11, 2016, near the end of the 31 day grace period.

108. On April 29, 2016, Johnson terminated Sharif's employment at the direction of the Board. From this time on, Johnson was responsible for administering the Health Plan, but assigned Financial Department staff additional duties that had previously been Sharif's.

109. On May 17, 2016, Johnson attempted to pay by wire transfer the April 15, 2016 premium, a total of $21,191.16, but that payment failed for insufficient funds.

110. On June 10, 2016, a Financial Department staff member attempted to pay by wire transfer the April 15 and May 15, 2016 premiums, a total of $47,306.97. This payment failed because the Financial Department staff member who initiated it was not an authorized user on Day-Mont's bank account.

111. As this balance of $47,306.97 remained unpaid after the grace period, on June 15, 2016, UHC cancelled Group Policy Number GA5U9418NM, effective June 15, 2016. UHC's cancellation notice required Day-Mont to "[p]lease advise your employees immediately that their coverage has been cancelled." Johnson did not inform plan participants of Group Policy Number GA5U9418NM's cancellation at this time.

112. On June 17, 2016, a Day-Mont employee emailed Johnson and cc'd all Day-Mont staff members to indicate that she had been denied medical coverage and informed that the Health Plan's insurance policy had been cancelled effective June 14, 2016. Johnson replied to all Day-Mont staff that same day, indicating that she had spoken to UHC and the Health Plan's insurance policy would be reinstated retroactively. As Day-Mont's CEO and as signatory on its bank accounts, Johnson knew or should have known that Day-Mont would be unlikely to get the Health Plan's insurance policy reinstated retroactively.

113.     On June 24, 2016, Johnson again emailed all Day-Mont staff to inform them that the Health Plan's insurance policy would be reinstated retroactively. As Day-Mont's CEO and as signatory on its bank accounts, Johnson knew or should have known that Day-Mont would be unlikely to get the Health Plan's insurance policy reinstated retroactively.

114.     On July 11 and 13, 2016, two additional Day-Mont staff members emailed Johnson and cc'd all Day-Mont staff members to indicate that they each had been denied medical coverage and informed that the Health Plan's insurance policy had been cancelled effective June 14, 2016.

115.     On July 14, 2016, Johnson again emailed all Day-Mont staff to inform them that the Health Plan's insurance policy would be reinstated retroactively. As Day-Mont's CEO and as signatory on its bank accounts, Johnson knew or should have known that Day-Mont would be unlikely to get the Health Plan's insurance policy reinstated retroactively.

116.     On July 21, 2016, Johnson emailed all staff to inform them that the Health Plan's insurance policy would not be reinstated retroactively or prospectively.

117.     At no time prior to, at the earliest, July 21, 2016 did Defendants inform Health Plan participants that the Health Plan's insurance policy had been cancelled and retroactively reinstated during February 2016.

118.     At no time prior to, at the earliest, July 21, 2016, did Defendants inform Health Plan participants that the March 15, 2016 premium payment had been paid late.

119.     At no time prior to, at the earliest, June 17, 2016, did Day-Mont or Johnson inform Health Plan participants that the April 15, 2016 attempted premium payment failed due to Day-Mont having insufficient funds in its bank account .

120.     At no time prior to, at the earliest, June 17, 2016, did Day-Mont or Johnson inform Health Plan participants that the April 15 and May 15, 2016 premium payments had not been made.

121.     At no time prior to, at the earliest, July 21, 2016, did Day-Mont or Johnson inform all Day-Mont employees that the Health Plan's insurance policy had been cancelled and would not be reinstated.

122.     Defendants' failure to timely inform Health Plan participants of the cancellation and retroactive reinstatement of the Health Plan's insurance policy constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

123.     Defendants' failure to timely inform Health Plan participants that Day-Mont had paid late or not paid premium payments due to UHC under the Health Plan's insurance policy constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

124.     Day-Mont and Johnson's failure to timely inform Health Plan participants of the Health Plan's continued effectiveness and affirmatively representing otherwise each constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

125.     Day-Mont and Johnson's failure to timely inform Health Plan participants of Day-Mont's inability to retroactively reinstate the Health Plan's insurance policy and affirmative representations otherwise each constitutes material misrepresentations as to the status of participants' benefits under the Health Plan.

126.     Health Plan participants were harmed by Day-Mont and Johnson's material misrepresentations, because they incurred medical expenses between June 14 and July 21, 2016 that they would not have incurred, but for Defendants' misrepresentations.

127.     Had Day-Mont and Johnson's informed Health Plan participants that Day-Mont had paid late or not paid in full premium payments to UHC, that the Health Plan's insurance policy had been cancelled, or that the Health Plan's insurance policy would not be reinstated, at least some participants would not have incurred uncovered claims, either by obtaining alternative health care coverage or by delaying voluntary procedures.

128.     By the conduct described in paragraphs 103 through 127 above, Day-Mont and Johnson:

a.     Failed to act solely in the interest of the participants and beneficiaries of the Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the Health Plan's administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

b.     Failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     Ordering Defendants to restore to the Annuity Plan and the Health Plan and the participants and beneficiaries of each Plan any losses, including interest, resulting from fiduciary breaches committed by Defendants or for which they are liable;

2.     Ordering Defendants to correct the prohibited transactions in which they engaged;

3.     Requiring the Annuity Plan to set off from Defendants Johnson's and Sharif's individual accounts the amount of losses, including lost opportunity costs, resulting from their fiduciary breaches, as alleged in Count I, as authorized by Section 1502(a) of the Taxpayer

Relief Act of 1997, Pub. L. No. 105-34, Section 1502(a), 111 Stat. 788, 1058-59 (1997) (codified at 29 U.S.C. §1056(d)(4)), if the losses to the Annuity Plan are not otherwise restored to the Plan by the Defendants;

4. In the event they are still fiduciaries, removing Defendants Johnson and Sharif from their positions as fiduciaries with respect to the Annuity Plan and the Health Plan;

5. Permanently enjoining Defendants Johnson and Sharif from acting as a fiduciary or service provider to any ERISA-covered employee benefit plan;

6. Permanently enjoining Defendants from violating the provisions of Title I of ERISA;

7. Awarding the Plaintiff the costs of this action; and

8. Granting such other and further relief as may be appropriate and just.


DATE: July 18, 2018


_____

**ADAM LUBOW**
Trial Attorney for Complainant
U.S. Department of Labor
1240 E. 9th St. Rm. 881
Cleveland, Ohio 44199
(216)522-3876
KATE S. O'SCANNLAIN
Solicitor of Labor
CHRISTINE Z. HERI
Regional Solicitor
BENJAMIN T. CHINNI
Associate Regional Solicitor